UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:05CV-105-M

**LARK DAVIS**                                                                                                                                       **PLAINTIFF**

**v.**

**TARGET CORPORATION**                                                                                                              **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on motion by Defendant, Target Corporation ("Target"), for summary judgment. (DN 42). The Plaintiff, Lark Davis ("Davis"), has alleged that she was wrongfully discharged from Target. Target maintains that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law with respect to all claims raised in Plaintiff's Complaint and First Amended Complaint. Fully briefed, this matter stands ripe for decision. For the following reasons, Defendant's motion for summary judgment is **GRANTED**.

### I. Standard of Review

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying the portion of the record which demonstrates the absence of a genuine issue of material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party themselves thereafter must produce specific facts demonstrating that a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving

party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Co.</u>, 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of scintilla of evidence in support of the [non-moving party's] position will be insufficient, there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477. U.S. at 252. It is against this standard that the court reviews the following facts.

## II. <u>Background</u>

Plaintiff Lark Davis ("Davis") was an Asset Protection Specialist at the Target store in Owensboro, Kentucky from March 1997 until her termination in February 2005. When Davis first applied for a position at Target in December 1996, the employment application stated:

> All Target team members are "at will" team members, which means that team members can terminate the employment relationship at any time, for any or no reason. Target reserves the same right. Target will not, and team members and applicants should not, interpret any verbal or written statement, policies, practices, or procedures as altering their "at will" status. (Davis Dep., Ex. 2).

Upon hiring, Davis also received a copy of Target's employee handbook which further explained that the handbook was "not a contract" and that it did not guarantee "employment for any length of time, or limit how the employment may end."(Davis Dep., p.100-101; Ex. 5, p.2).

Despite these warnings to its employees of their "at-will" status, the company did have an internal policy relating to disciplining and terminating its employees. (Davis Dep. Ex. 17.) This "coaching and corrective action" policy clarifies what Target considers to be "unacceptable team member conduct" and establishes "recommended procedures for dealing with team member conduct

2

or work performance that does not meet company standards." (Id. at p. 1). The introduction to this policy also reiterates that Target employees are employed at will and that Target can terminate them at any time for any reason. (Id.) As a guideline, however, the policy instructs Target supervisors that there are four types of "corrective actions" they can take to discipline employees for unsatisfactory performance or unacceptable conduct. Accordingly, when an employee continually performs his/her work unsatisfactorily, a supervisor may progressively issue 1) a "counseling"; 2) a "written warning"; 3) a "final warning"; and, then, if necessary 4) a "termination." (Id. at p. 3). The policy also states that any "team member who receives three corrective action steps...in a rolling one-year period of time will receive a Final Warning. A fourth corrective step in the subsequent 12 months...will result in termination." (Id. at p. 17).

During her time at Target, Davis received several positive performance reviews. (DN 49, Sealed Response, Ex. 1). However, during this time, she also received corrective actions pursuant to Target's disciplinary policy. (Davis Dep., Exhibits 8-11, and 15). On September 27, 2004, she received her first corrective action - a "counseling" for "unsatisfactory performance"- for failing, on at least eighteen occasions, to meet the mandatory daily documentation requirements of her position. (Id., Ex. 8). On September 29, 2004, she received a "counseling" for "unacceptable conduct" because she violated company policy when she left company property while on her break. (Id., Ex. 9). Then, on January 1, 2005, she received another "counseling" for "unacceptable conduct" for working overtime without authorization. (Ex. 10). On January 21, 2006, she was placed on a "final warning" which meant that "any further infraction requiring corrective action [would] result in...termination." (Id., Ex. 11). Ultimately, on February 25, 2005, Davis received another "counseling" for "unacceptable conduct." (Id., Ex. 15). Following this counseling, pursuant

3

to Target policy, Davis was terminated.

It is this last counseling , her subsequent termination, and the facts surrounding both that form the basis of Davis' claims against Target. She contends that she received her last counseling and subsequent termination in retaliation for her cooperation with a law enforcement task force investigation that ultimately resulted in a complaint from a Target customer.[1] (Response, p.2). Davis received her last "counseling" for violating company policy by failing to obtain permission from a District Assets Protection Team Leader ("DAPTL") or an Executive Team Leader of Assets Protection ( "ETL-AP") before "allowing police officers to use the Assets Protection office and camera system to identify possible drug-related issues." (Davis Dep., Ex. 15). According to Target, this conduct violated its Assets Protection directive which states: "Requests to use... digital camera equipment for business purposes other than investigations must be approved by the DAPTL." (Defendant's Memorandum, p. 5-6; Davis Dep., Ex. 6, "Common Directives: Equipment Use").

The specific facts relating to how police officers first came to use Target's surveillance cameras to monitor pseudoephedrine purchases, and the scope and length of that practice, are somewhat unclear. It appears from the record that law enforcement officers first began using Target's cameras and facilities to monitor pseudoephedrine purchases in November 2004, after they received permission and instruction from Davis' supervisor, Chuck Dietrick, the Owensboro Target's Assets Protection Team Leader. (Davis Dep.; Conley Dep., p.83, 84; Champion Dep., p. 92; Stinnett Aff. ¶5). Mr. Dietrick apparently did not seek approval from his DAPTL - Joel Nivens-

---

[1] On or around February 22, 2006, a customer who purchased pseudoephedrine called Target to complain that that police had followed her from the store, knocked on her door, and asked to search her house. (Nivens Dep., p.20-21).

for the officers to conduct surveillance in the store, as required by Target policy. (Nivens Dep., p. 25-26). In December, the officers returned to conduct similar surveillance and this time Mr. Dietrick did seek Nivens approval before allowing them to conduct the sting operation. (Nivens Dep., p.26). Nivens told Mr. Dietrick that the officers had permission to use the equipment of a "couple of days." (Nivens Dep., p. 27). Mr. Dietrick, however, allowed the officers to use the equipment for five days (Conley Aff., ¶ 3).

In February, Mr. Dietrick took a leave of absence and assigned his administrative duties to the Plaintiff (Dietrick Dep., p.38, 39, 47). Two Target Assets Protection supervisors from Evansville assumed his "oversight duties." (Dietrick Dep., p. 39). These two individuals were supposed to travel to the Owensboro store periodically while Mr. Dietrick was absent to ensure that the Assets Protection employees in Owensboro were "functioning properly and effectively." (Id.) It was during this period of time that the officers again requested use of the Owensboro Target's surveillance equipment. Plaintiff Davis allowed the officers to use the equipment and they conducted surveillance there for six days. During this surveillance operation, Target received a complaint from a customer stating that she had purchased pseudoephedrine from Target and was followed home from the store by police. (Nivens Dep., p.20-21). Following this complaint, the two supervisors from Evansville visited the Owensboro store and discovered Davis and one or two law enforcement officers in the Assets Protection office using the store's surveillance equipment. (Davis Dep., p. 190; Raber Dep. p.46, 54; Bunker Dep., p. 23). They contacted their supervisor - Mr. Nivens - who decided that Davis should be given a "final warning" for permitting law enforcement officers to use Target's surveillance equipment without his approval, in violation of Target policy. (Nivens Dep., p. 43-44, 47). Because Davis was already on a "final warning," she was terminated.

5

(Id. at 47-48). Over one year after Davis was terminated, Mr. Dietrick was given a "final warning" for allowing the officers to use Target's surveillance equipment in November 2004 without Mr. Nivens' permission. (Conley Aff. ¶ 3; Nivens Dep., p. 26, 51-55).

In her complaint, Plaintiff claims that her last "final warning" and her subsequent termination were (1) in violation of the well-defined public policy of cooperation with law enforcement to curb the criminal manufacturing of illegal drugs; (2) in retaliation of plaintiff's cooperation with law enforcement enforcement authorities; and (3) a breach of the express and/or implied contract of employment with the defendant. (DN 1, Complaint, ¶ 8). In her First Amended Complaint, she also alleges that Target violated KRS 333.050, et. seq., when it wrongfully discharged her on the basis of sex. (DN 18, ¶ 2).

### III. Discussion

A. Termination as Retaliatory and/or as a Violation of "Well-Defined" Public Policy

The Kentucky Supreme Court, in limiting judicially-created exceptions to the employment at-will doctrine, has held that a wrongful discharge must be "contrary to a fundamental and well-defined public policy...[as] evidenced by a constitutional or statutory provision." Firestone Textile Co. Div. v. Meadows, 666 S.W.2d 730, 731. (Ky. 1983) (where the court held that an employee could not be terminated for pursuing a workers' compensation claim under a Kentucky statute). Two years later, in Gryzb v. Evans, 700 S.W.2d 399, 402 (Ky. 1985) (where the court rejected a retaliatory discharge claim), the Court adopted a caveat to this judicial exception, and clarified that only two situations exist where grounds for discharging an employee are so contrary to public policy as to be actionable absent explicit legislative statements prohibiting the discharge: (1) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the

6

course of employment"; or (2) "when the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment." In seeking to ensure a narrow application of this judicial exception to the at-will doctrine, the court held that an "employment-related nexus" is required between the statute relied upon by the plaintiff and the discharge. Id. For example, in Boykins v. Housing Authority of Louisville, 842 S.W. 2d 527 (Ky. 1992), the court declined to find a violation of public policy where a woman was terminated after she sued her employer. The court noted that "there is no statutory or constitutional provision which explicitly creates a public policy which prohibits retaliatory discharge." Id. at 529. Finally, a Kentucky appellate court has also held that where a statute's "primary purpose" is not the protection of employees, a public policy claim fails. Shrout v. TFE Group, 161 S.W.3d 351, 354 (Ky. App. 2005).

In this case, Davis argues that she was fired for cooperating with police authorities and that this retaliation is a violation of a public policy which encourages cooperation with law enforcement authorities. (DN 49, Sealed Response, p. 2-3). The only Kentucky case that Davis relies on to support this legal theory is the unpublished decision of Kentucky Farmers' Bank v. Nutter, 1987 WL 194726 (Ky. App. 1987). In that case, the Kentucky Court of Appeals held that the discharge of a bank employee because he worked after-hours assisting local law enforcement officials in a sting operation was a violation of public policy. The court relied upon two Kentucky statutes to sustain its opinion: (1) KRS 503.040, which provides individuals with a legal defense to a criminal charge if they have been required to assist a police officer in the performance of his duties; and (2) KRS 70.060 which authorizes police officers to summons individuals to assist them in the performance of their duties. The precedential value of Nutter is doubtful, not only because the opinion is unpublished, but also because the Kentucky Supreme Court in Boykins insists that there

7

be an "employment-related nexus" between the constitutional policy that has been allegedly violated by the plaintiff's discharge and the discharge itself. 842 S.W.2d at 530. Neither of <u>Nutter</u>'s statutes, KRS 503.040 nor KRS 70.060, have anything to do with employment rights. In this case, Davis also relies on KRS 503.040; KRS 70.060; as well as KRS 524.055, which prohibits retaliation against a witness or any person "involved in legal process." (DN 49, Sealed Response, p. 15). However, none of these statutes attempts to protect, or even pertains to, the rights of employees, and they cannot support Davis' claim that her discharge was contrary to public policy.[2]

Accordingly, Defendant Target is entitled to judgment as a matter of law on this claim.

B. <u>Termination as Breach of Implied Contract</u>

Davis also alleges that Target's employee handbook and the personnel policies contained therein are evidence of an implied contract of employment. (DN 49, Sealed Response, p. 13-14). Under Kentucky law, an employer may ordinarily discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible. <u>Grzyb</u>, 700 S.W.2d 399, 400; <u>Firestone</u>, 666 S.W.2d 730, 731. As discussed above, Kentucky has created a narrow exception to this general rule, but it has created no other exception concerning the right of employers to discharge at-will employees. The Kentucky Supreme Court has held that an express personnel policy can become a binding contract where the employee continues to work while the policy if in effect. <u>Parts Depot, Inc. v. Beiswenger</u>, 170 S.W.3d 354, 363 (Ky. 2005). The Kentucky Supreme Court has never held that a company policy expressed in an employee handbook, which contains

---

[2]Notably, in 2005, the Sixth Circuit upheld a district court's dismissal of a wrongful discharge claim based on Plaintiff's cooperation with law enforcement because the Plaintiff could not point to any "fundamental and well-defined public policy as evidenced by existing law requiring that Kentuckians cooperate with law enforcement." <u>Maiden v. N. Am. Stainless,</u>, 183 Fed. Appx. 485, 487.

8

language disclaiming the formation of a contract, can create an implied contract despite the general terminable-at-will rule. The Kentucky Court of Appeals has specifically held that employee handbooks which contain these disclaimers cannot be the basis for breach of contract claims based on termination. Nork v. Fetter Printing Co., 738 S.W.2d 824 (Ky. App. 1987). Additionally, another court in this district has held that where an employment application contains a provision affirming an employee's at-will status, policies in a company handbook do not constitute an agreement which supersedes the terminable-at-will provision in the employment application form. McCart v. Brown-Forman Corp., 713 F.Supp. 981, 983 (W.D. Ky. 1988). And, perhaps, most importantly, the Kentucky Supreme Court cites to these cases in Parts Depot and, although it distinguishes the facts in these cases from the facts in Parts Depot, it does attempt to modify their rules. 170 S.W.3d at 363.

Thus, where both the employment application Davis filled out and the employee handbook she received contained contract disclaimers, Davis' claim of a breach of an implied employment contract fails. Therefore, Defendant Target is entitled to judgment as a matter of law on this claim.

C. Termination Based on Discrimination

Finally, Davis claims that Target violated KRS 344.040 by wrongfully discharging her on the basis of sex. (DN 18, First Amended Complaint, ¶ 2). This claim is based on Davis' allegation that she was discharged for certain conduct in which male employees also engaged and for which they were not discharged or disciplined. (Id.) Specifically, she claims that Target's failure to discipline Chuck Dietrick for his role in the law enforcement's presence at Target until one year after her termination is evidence of gender discrimination. (DN 49, Sealed Response, p. 16). Target, however, maintains that once it learned of Mr. Dietrick's related misconduct - through an officer's deposition testimony - it disciplined Mr. Dietrick more severely than it disciplined Davis by

9

immediately placing him on a "final warning." (DN 51, Sealed Reply, p. 14; Nivens' Dep, p. 52-53).

The relevant section of the Kentucky Civil Rights Act provides that it is unlawful for an employer to "discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...sex." KRS 344.04(1). The Kentucky Supreme Court has held that since this language tracks Title VII of the Federal Civil Rights Act, it "should be interpreted consonant with federal interpretation." Meyers v. Chapman Printing Co. Inc., 840 S.W. 2d 814, 821 (Ky. 1992).

The United States Supreme Court set forth an evidentiary framework for analyzing cases alleging workplace discrimination based upon circumstantial evidence in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case and creating a presumption of discrimination by demonstrating: (1) membership in a protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly-situated members of the unprotected class. 411 U.S. at 802; Warfield v. Lebanon Correctional Institution, 181 F.3d 723, 728-729 (6th Cir. 1999). Once the plaintiff establishes a prima facie case, an inference of discrimination arises. The burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for the plaintiff's discharge. McDonnell Douglas, 411 U.S. at 802. The plaintiff then assumes the final burden of proving that an employer's articulated nondiscriminatory reason for taking an adverse action towards her was pretextual. Warfield, 181 F. 3d at 729.

Here, Davis clearly meets the first two criteria necessary to establish a prima facie case of discrimination: she is female and she was fired. Id. However, in order to satisfy the third criteria

, Davis must show that she was "qualified" for her position. A person establishes that she is "qualified" for her position by demonstrating that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction. Id.; Ang v. Procter Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991). Davis has not presented evidence sufficient to find that she was meeting the legitimate expectations of her employer. Although Davis did receive several positive performance reviews during her time at Target (DN 49, Sealed Response, Ex. 1), in the months preceding her termination, she received three disciplinary actions - one for unsatisfactory performance and two for unacceptable conduct. (DN 43, Davis Dep., Exhibits 8-11). And, in the month actually preceding her termination, she was specifically placed on a "final warning" and admonished that any "further infraction requiring corrective action will result in termination of your employment with Target." (Id., Ex.11). Accordingly, Davis has not established that she was "qualified" for her position as a matter of law and has not satisfied the third criteria necessary to establish a prima facie case of discrimination.

Finally, Davis has not presented evidence sufficient to find that she met the fourth criteria of her case. Although she has alleged that she was treated differently from Mr. Dietrick, she has not established that he was a "similarly situated member" of a non-protected class. For two individuals to be similarly situated, the must have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964, F.2d 577, 583 (6th Cir. 1992). Accordingly, a plaintiff cannot prove that she is similarly situated with another employee who does not share her disciplinary history. Martin v. United States Playing Card Co., 1998 U.S. App. LEXIS 31016, *11-12 (6th Cir.1998); Tkacz v. Sears, Roebuck, & Co., 1991 U.S. App. LEXIS 9360, *9-10 (6th Cir. 1991).

Here, Mr. Dietrick, the only individual to whom Davis compares herself, was not similarly situated to her because he was not on a "final warning" and had received no disciplinary actions prior to this incident. (DN 43, Nivens Dep., p. 51-53). Further, because he was actually placed on a "final warning" for his misconduct, he was disciplined more severely than Davis, who received a final warning following three disciplinary actions. (Id.)

Thus, because Davis has not established a prima facie case of discrimination, this claim too fails as a matter of law.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.

cc: Counsel of Record